UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ANTHONY GRECCO,

                 Petitioner,

     v.

UNITED STATES OF AMERICA,

                 Respondent.

No. 19-CV-7950 (KMK)

---

UNITED STATES OF AMERICA

     v.

ANTHONY GRECCO,

                 Defendant.

No. 14-CR-760 (KMK)

<u>OPINION & ORDER</u>

---

<u>Appearances</u>:

Anthony Grecco
*Pro Se Petitioner*

Michael Gerber, Esq.
Scott Hartman, Esq.
George Turner, Esq.
United States Attorney's Office
New York, NY
*Counsel for Respondent*

KENNETH M. KARAS, United States District Judge:

       Anthony Grecco ("Petitioner" or "Grecco") has filed a Petition for a Writ of Habeas

Corpus (the "Petition"), pursuant to 28 U.S.C. § 2255, to vacate, set aside, or correct his

judgment of conviction, entered on August 21, 2016, which included a sentence of life

imprisonment, imposed after Petitioner was found guilty by a jury of narcotics conspiracy, Hobbs Act robbery, and Travel Act murder, in violation of 21 U.S.C. §§ 841 and 846 and 18 U.S.C. §§ 1951 and 1952.  (*See generally* Pet. for Writ of Habeas Corpus ("Pet.") (Dkt. No. 1, Case No. 19-CV-7950; Dkt. No. 80, Case No. 14-CR-760).)[1]  For the foregoing reasons, the Petition is denied.

## I.  Background

### A.  Factual Background

#### 1.  Pre-Trial

On October 28, 2014, the Government charged Grecco in a Complaint with Hobbs Act robbery and Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951, based on his plan to rob Ryan Ennis ("Ennis"), a customer of Grecco's marijuana trafficking business.  (Dkt. No. 1, Case No. 14-CR-760.)  Specifically, the Complaint alleged that on August 26, 2014, Grecco robbed Ennis at knifepoint in Ossining, New York, and killed Ennis during the robbery. (*Id.*)  On November 4, 2014, Grecco was presented and detained, and Paul Rinaldo, Esq., was appointed to represent Grecco.  (Dkt. No. 7, Case No. 14-CR-760.)  On November 18, 2014, a grand jury returned a two-count Indictment charging Grecco with the same robbery offenses alleged in the Complaint.  (Dkt. No. 5, Case No. 14-CR-760.)  In March 2015, Grecco retained new counsel, John Calcagni, Esq.  (Dkt. No. 8, Case No. 14-CR-760.)  Troy Smith, Esq. entered the case in August 2015 as Mr. Calcagni's co-counsel.  (Dkt. No. 14, Case No. 14-CR-760.)

---

[1] Certain of the Parties' papers were filed on Petitioner's criminal docket, Case No. 14-CR-760, and certain on Petitioner's civil docket, Case No. 19-CV-7950.  The docket citations indicate on which docket each document was filed.

On September 16, 2015, a grand jury returned a superseding indictment (the "S2 Indictment"), charging Grecco in five counts: (1) Hobbs Act robbery conspiracy, in violation of 18 U.S.C. § 1951; (2) Hobbs Act robbery, in violation of 18 U.S.C. § 1951; (3) Travel Act murder, in violation of 18 U.S.C. § 1952(a)(2) and (a)(3)(B); (4) marijuana conspiracy, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(D); and (5) heroin and cocaine conspiracy, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C).  (Dkt. No. 15, Case No. 14-CR-760.)  The S2 Indictment alleged that Grecco, in furtherance of his narcotics trafficking business, traveled from New Jersey to Ossining and robbed and murdered Ennis.  (*Id.* ¶ 3.)  The Travel Act murder charge carried a maximum sentence of life imprisonment.  *See* 18 U.S.C. § 1952(a)(3)(B).

The Court ultimately set a trial date of January 11, 2016.  (*See* Dkt. (minute entry for September 21, 2015).)  Prior to trial, the Government filed superseding indictments on November 18, 2015 (the "S3 Indictment") and December 14, 2015 (the "S6 Indictment"), both of which charged Grecco with the same five offenses charged in the S2 Indictment; the superseding indictments contained certain modifications to statutory charging language, but did not add any counts or alter the potential penalties facing Grecco.  (Dkt. Nos. 16, 27, Case No. 14-CR-760.)  The operative Indictment at trial was the S6 Indictment.

## 2.  Trial

Trial commenced on January 11, 2016, and ended on January 22, 2016 with a guilty verdict on all counts.  (*See* Dkt. (minute entry for January 22, 2016).)  The Government presented testimony of a number of witnesses, including Sean Ingram and Andrea Beatty, cooperating witnesses who testified that they accompanied Grecco from New Jersey to Ossining on August 26, 2014, and who pled guilty to aiding and abetting the robbery and murder of Ennis. Ingram and Beatty testified that Grecco warned them during the drive to Ossining that he might

kill Ennis, that Grecco indicated to them later that night that he had killed Ennis, and that they assisted Grecco in covering his tracks and disposing of any evidence of the murder. (Tr. 88, 91, 94–95, 112, 119–20, 456–59, 462–66.) Two other drug cohorts of Grecco, Aaron Tupin and Ryan Wyckoff, testified pursuant to immunity orders. Tupin testified that Grecco borrowed a knife from him just hours before the murder, and never returned it. (Tr. 574–77, 582–83.) Wyckoff testified that, after the murder, Grecco told him that there would be no more business with Ennis. (Tr. 305.) The Government also presented testimony of law enforcement officers who responded to the scene of the murder and who introduced crime scene photographs and cellphone records. The cellphone records established that Ennis received a call from Grecco as Grecco was approaching Ennis's apartment on the night of August 26, 2014, and that Ennis never used his cellphone again after that call. (Tr. 72, 684–86.) The Government also presented evidence that Ennis's dead body was discovered the day after Grecco was at that apartment, in a pool of blood and with knife wounds to Ennis's neck that left him nearly decapitated. (Tr. 38–39, 46–47, 338–39.)

Grecco's trial counsel, Mr. Calcagni and Mr. Smith, aggressively cross-examined the Government's witnesses. (*See* Tr. 48–53 (Officer Fischer); 59–71 (Kelly Ennis); 136–70, 182–271 (Ingram); 309–31 (Wyckoff); 354–82, 387–91 (Detective Piccirilli); 405–30, 433–35 (Dr. Gill); 490–529, 542–56, 728–89, 804–08 (Beatty); 590–623, 696–702 (Tupin); 686–95 (Special Agent Perry).) For example, counsel extensively cross-examined Detective Piccirilli of the Forensic Investigations Unit of the Westchester County Department of Public Safety regarding deficiencies in the forensic examination of the murder scene, (Tr. 357–82); attacked Tupin's credibility in light of his history of drug use and distribution, (Tr. 615–17); and elicited from Wyckoff that Grecco was a peaceful person, (Tr. 321).

4

Trial counsel's cross-examination of the Government's cooperating witnesses, Beatty and Ingram, also was extensive and probing.  (*See* Tr. 136–70, 182-271, 490–529, 542–56, 728–89, 804–08.)  For example, during Ingram's cross-examination, which lasted days, defense counsel sought to impeach Ingram with prior statements he had made to law enforcement during two video-recorded interviews in fall 2014.  (Tr. 151–66.)  Ingram testified that he did not recall the details of the interviews, (Tr. 164), after which defense counsel sought and successfully obtained a stipulation from the Government summarizing certain of Ingram's statements during those interviews, including that Ingram had initially denied having any knowledge about Ennis's murder and stated that he had never traveled to Ossining with Grecco and Beatty, (Tr. 827–30).

Defense counsel presented a case, which consisted of the aforementioned stipulation regarding Ingram's prior statements and the testimony of three witnesses.  The defense recalled Ingram to the stand, and called Grecco and his sister, Amberrose Grecco.  As for Ingram, defense asked him about his statement to law enforcement, during one of his interviews in fall 2014, that if someone tried to confide in him about committing a murder, he would "chop their neck."  (Tr. 875–79.)  Ingram explained that he meant that he would try to stop someone from giving him information that might make him an accessory to a crime, and that when he used that expression during the interview, he had not yet learned how Ennis had been killed.  (Tr. 877–78.)  Ms. Grecco testified that she believed her brother was a peaceful person and had a reputation for peacefulness. (Tr. 835–44.)

Grecco also testified.  (*See* Tr. 880–1021.)  Over the course of a lengthy direct examination, Grecco provided a different version of events than that presented by the Government's witnesses, denying that he had robbed or harmed Ennis.  (Tr. 880–977.)  Grecco acknowledged that he was a marijuana dealer; Ennis was a regular customer who owed him

thousands of dollars; on August 26, 2014, Grecco traveled with Ingram and Beatty to meet Ennis

in Ossining; Grecco brought a knife that he had obtained from Tupin, and a backpack full of

linens—but no marijuana—to Ossining; Grecco met Ennis inside the Ossining apartment where

Ennis was waiting, while Ingram and Beatty stayed with the car; and Grecco left the apartment

with about $9,000.  (*See* Tr. 883–89, 903, 908, 926–31, 964–69.)  But Grecco maintained that his

meeting with Ennis was uneventful and Ennis gave him the $9,000.  (Tr. 931.)  Grecco claimed

that Tupin gave him the knife that morning, but only as collateral for heroin supplied by Grecco,

and that he brought a backpack full of linens to Ossining so that he could signal to Ennis if

something went wrong (by emptying the backpack).  (Tr. 924–26, 965–66, 988–91.)  Grecco also

denied that he ever said anything to Ingram or Beatty indicating that he intended to, or did, rob

and kill Ennis.  (Tr. 934–35.)

        During cross-examination, the Government inquired about Grecco's videorecorded post-

arrest interview in September 2014, for the purpose of impeaching Grecco.  (Tr. 993–99, 1012–

14.)  The Government did not seek to introduce Grecco's post-arrest statements into evidence at

any point during the trial.  Grecco initially testified that he did not remember what he had said

during the interview.  (Tr. 996.)  After being shown portions of the video of the interview,

Grecco recalled that during the interview, he had initially claimed that none of his marijuana

customers was located outside of New Jersey, that he had not taken any recent trips out of New

Jersey, and that he did not know anyone named Ryan Ennis.  (Tr. 1012–14.)  Grecco also

admitted to stating, later during that interview, that "it was about the money," "the plan wasn't

for him to die," and "if I'm lucky, I'll be locked up for the rest of my life."  (Tr. 1013–14.)

Grecco further admitted that, when asked during the interview why it had happened, Grecco

responded that "it was just so fast."  (Tr. 1014.)  Grecco also acknowledged that hours before

leaving for Ossining to meet Ennis, Grecco used his cellphone to run a Google search about how to use a pillow as a silencer for a gun. (Tr. 996–97, 1018, 1021.) Grecco attempted to explain this by claiming that he "look[s] a lot of things up," and that: "I've known that, since the movie Bad Boys I, you cannot [use a pillow as a silencer]. So, I mean, I could have been proving to someone the fact or looking it up for that reason." (Tr. 1018.)

On redirect examination, Grecco testified that he had initially lied to law enforcement during the September 2014 interview about whether he knew Ennis and had recently traveled out of New Jersey because he was "scared" of Ingram. (Tr. 1015.) Indeed, throughout the trial, the defense presented an alternative theory of the crime, suggesting that after the purportedly uneventful meeting between Grecco and Ennis, Ingram returned to Ossining later that night or the next day for the purpose of robbing Ennis, and killed him, and that Ingram and Beatty were framing Grecco. (Tr. 32, 1127.)

### 3.  Post-Trial

Sentence was held on August 10, 2016. The Court imposed a sentence of life imprisonment, which was the sentence called for by the Sentencing Guidelines and recommended by the Probation Department. (Dkt. No. 49, Case No. 14-CR-760.)

Grecco appealed his conviction. New counsel, Harry Sandick, Esq., was appointed to represent Grecco on appeal. Grecco challenged his conviction on four grounds: (1) the Court violated his Confrontation Clause rights by permitting the Government to introduce into evidence Ennis's autopsy report without calling as a witness the medical examiner who prepared the report; (2) the Court erred in precluding Grecco from testifying—as he attempted to during his direct examination—that Ingram had supposedly confessed to Grecco, after the murder, that Ingram was the murderer; (3) the Court erred by failing to adequately investigate purported juror

misconduct—specifically, the fact that after summations, multiple jurors were overheard by the courthouse elevators discussing, without reference to the substance of the case, the Government's assertion made during rebuttal that each juror would not remember the opening statements exactly the same way; and (4) the cumulative effect of the claimed errors deprived Grecco of a fair trial. *See United States v. Grecco*, 728 Fed. Appx. 32, 33 (2d Cir. 2018).

The Second Circuit issued a summary order affirming Grecco's conviction. *Id.* at 36. The Second Circuit held that (1) it need not determine whether admitting the autopsy report was proper because any error was harmless, as "the amount of other evidence in the case against Grecco created such a strong record that excluding the autopsy report would not have altered the verdict[,]" *id*. at 34; (2) the Court did not abuse its discretion in ruling that Grecco's testimony that Ingram had supposedly confessed to Ennis's murder was inadmissible hearsay, *id*. at 34–36; (3) Grecco had waived any challenge to the Court's handling of the alleged juror misconduct by declining to request any additional inquiry or object after the Court concluded its questioning of the jurors, *id*. at 36; and (4) the cumulative error doctrine was inapplicable, given the lack of error by the Court and that, in any event, any error did not deprive Grecco of a fair trial, *id.*

B.  Procedural History

Grecco timely filed the Petition, after receiving an extension from the Court of the deadline for filing for relief under § 2255.  (Dkt. Nos. 79–80, Case No. 14-CR-760.)

The Government submitted its Opposition on February 10, 2020 ("Opp'n Mem.").  (Dkt. No. 83, Case No. 14-CR-760.)

<u>II.  Discussion</u>

<u>A.  Standard of Review</u>

A prisoner in federal custody may move to vacate, set aside, or correct his sentence only "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack."  28 U.S.C. § 2255(a).[2]  "Because collateral challenges are in 'tension with society's strong interest in the finality of criminal convictions, the courts have established rules that make it more difficult for a defendant to upset a conviction by collateral, as opposed to direct, attack.'" *Yick Man Mui v. United States*, 614 F.3d 50, 53 (2d Cir. 2010) (quoting *Ciak v. United States*, 59 F.3d 296, 301 (2d Cir. 1995)).  To prevail on a collateral attack of a final judgment under § 2255, a petitioner must demonstrate either the existence of a "constitutional error . . . or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice."  *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995) (quotation marks omitted); *accord Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000); *Rodriguez v. United States*, No. 11-CV-2957, 2013 WL 6171618, at *3 (S.D.N.Y. Nov. 25, 2013), *aff'd*, 679 F. App'x 41 (2d Cir. 2017).

In ruling on a § 2255 petition, the district court is required to hold a hearing "[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no

---

[2] 28 U.S.C. § 2255(a) provides, in full:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

relief." 28 U.S.C. § 2255(b).  Moreover, a hearing is not required where the petitioner's

allegations are "vague, conclusory, or palpably incredible."  *Machibroda v. United States*, 368

U.S. 487, 495 (1962).  To justify a hearing, the petition "must set forth specific facts supported

by competent evidence, raising detailed and controverted issues of fact that, if proved at a

hearing, would entitle [the petitioner] to relief."  *See Gonzalez v. United States*, 722 F.3d 118,

131 (2d Cir. 2013).  Finally, because Petitioner filed his initial Petition pro se, the Court

construes the Petition and his other submissions "liberally and interpret[s] [them] to raise the

strongest arguments that they *suggest*."  *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474

(2d Cir. 2006) (quotation marks omitted); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007)

("[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than

formal pleadings drafted by lawyers." (italics and citation omitted)).

    B.  Analysis

        1.  Counsel's Alleged Failure to Call a Drug Expert

Petitioner first claims that his trial counsel provided ineffective assistance because they

failed to call an expert regarding the effects of drug use, and otherwise failed to move to bar

testimony by witnesses with a history of drug use or impeach them on that ground.  (Pet. 13–14.)

Initially, it bears noting that "[i]t is well-settled that the decision whether to call any

witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of

the sort engaged in by defense attorneys in almost every trial."  *Coke v. Superintendent, Green

Haven Corr. Facility*, No. 06-CV-811, 2010 WL 475274, at *7 (W.D.N.Y. Feb. 5, 2010)

(citation, quotation marks, and alteration omitted).  Accordingly, "[c]ourts applying *Strickland*

are especially deferential to defense attorneys' decisions concerning which witnesses to put

before the jury.  The decision not to call a particular witness is typically a question of trial

strategy that [reviewing] courts are ill-suited to second-guess." *Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005) (second alteration in original) (citation and quotation marks omitted); *see also Eze v. Senkowski*, 321 F.3d 110, 129 (2d Cir. 2003) ("A defense counsel's decision not to call a particular witness usually falls under the realm of trial strategy that we are reluctant to disturb."). Simply put, a court should not, "on a cold record[,] . . . second guess" a decision not to call a witness "unless there is no strategic or tactical justification for the course taken." *United States v. Luciano,* 158 F.3d 655, 660 (2d Cir 1998). This principle applies with equal force to the decision to call, or not call, expert witnesses. "[W]here an expert would only marginally assist the jury in its role as fact finder, an attorney's decision not to call an expert is more likely to fall within the bounds of reasonable performance and less likely to prejudice the defendant." *Massaro v. United States,* No. 97-CV-2971, 2004 WL 2251679, at *4 (S.D.N.Y. Oct. 5, 2004) (citation and quotation marks omitted).

In evaluating trial counsel's apparent choice not to call an expert to testify about the potential impact of narcotics use on the Government's witnesses, Petitioner has failed to establish any constitutionally ineffective representation. To the extent trial counsel believed that some of the Government's witnesses used narcotics to such an extent that it would affect their recall capacity, it would have been reasonable to cross examine them directly, and that is exactly what trial counsel did. For example, trial counsel got Ingram to admit that he regularly used many different narcotics and consumed alcohol, including on the night of Ennis' murder. (*See* Tr. 189–93.) Counsel also got Ingram to acknowledge that he had lied to law enforcement officials about his drug and alcohol use on the night of Ennis' murder. (*See* Tr. 191.) Similarly, counsel elicited testimony from Beatty where she too admitted to using drugs and consuming alcohol on a regular basis. (*See* Tr. 510–11.) And, based on this testimony, trial counsel argued

to the jury that it should not credit Ingram's and Beatty's testimony, among many other reasons, because they were "drug addict[s]."  (*See* Tr. 1120, 1122.) [3]  Under these circumstances, the Court concludes that trial counsel's strategic and tactical choices were reasonable and there was no need to call an expert witness to make the obvious point that Ingram's and Beatty's credibility was suspect given their admitted regular narcotics (and alcohol) consumption.  *See Unites States v. Meehan,* No. 11-CR-440, 2016 WL 4901128, at *21 (E.D. Pa. Sept. 14, 2016) ("Trial counsel for Defendant made a strategic decision not to call an expert to testify on the effects of drug use. Rather, he reasonably believed that it was in the best interest of Defendant to extensively cross-examine Ms. Sabatino to support the defense theory that she was fabricating the story to make a better deal with the Government, and to allow the jury to hear about the effects of prolonged drug use on her memory.  This trial strategy . . . was reasonable and did not prejudice Defendant."); *Id.* at *23 (citing evidence that effects of drug use on witnesses' memory was "common knowledge," thus making decision not to call an expert to testify to such was not ineffective; *Williams v. Herbert,* 435 F. Supp. 2d 199, 206 (W.D.N.Y. 2006) ("[I]t was reasonable for defense counsel to make the strategic decision not to call an expert witness to

---

[3] Trial counsel grilled both Ingram and Beatty (the Government's two main cooperators) during cross examination on a number of topics unrelated to their drug use that was relevant to their credibility.  For example, Grecco's trial counsel established, among other things, that Ingram used a fake name in the past, (Tr. 137), deleted text messages to hide them from law enforcement, (*id.*), instructed Beatty (his then girlfriend) to lie to law enforcement officials, (Tr. 138), lied to law enforcement officials in this and other investigations, (Tr. 138–39, 150–52, 154–57), and was cooperating to reduce his sentencing exposure, (Tr. 140–49).  Trial counsel got Beatty to admit that she had violated a cooperation agreement she had with prosecutors in a court martial proceeding, (Tr. 507), lied during proffer sessions, (Tr. 550–52), omitted certain statements regarding Grecco's conduct, (Tr. 739–40), and was testifying to reduce her sentencing exposure, (Tr. 520–26).  Thus, there can be no serious question that trial counsel made a strategic choice to impeach these two key Government witnesses and executed that strategy by eliciting substantial amounts of impeachment testimony directly from them.

present testimony concerning the effects of cocaine on the victim's behavior, particularly because Williams had never alleged that the victim had been exhibiting aberrant, potentially drug-induced conduct.").

Moreover, to the extent Grecco complains that trial counsel should have moved to preclude testimony because of certain witnesses' history of drug use, there is no legal basis for such a motion; counsel cannot have been ineffective for failing to raise a meritless argument. *See United States v. Regalado*, 518 F.3d 143, 149 n.3 (2d Cir. 2008) ("[F]ailure to make a meritless argument does not amount to ineffective assistance."); *United States v. Kirsh*, 54 F.3d 1062, 1071 (2d Cir. 1995) ("[T]he failure to make a meritless argument does not rise to the level of ineffective assistance[.]" (citations omitted)).

Along similar lines, the Second Circuit has repeatedly held that "[d]ecisions whether to engage in cross-examination, and if so to what extent and in what manner, are . . . strategic in nature." *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987); *see also Eze*, 321 F.3d at 127 ("The conduct of examination and cross-examination is entrusted to the judgment of the lawyer[.]" (alteration, citation, and quotation marks omitted)). Here, trial counsel vigorously cross-examined and sought to impeach the Government's witnesses, identifying inconsistencies in their accounts and instances when their accounts had changed. This was consistent with the theory pursued by trial counsel—that Ingram or Beatty did not misremember the events surrounding Ryan Ennis's death, but that Ingram murdered Ennis, and that Ingram and Beatty were framing Grecco for that murder. Calling a defense expert about the effects of drug use, and thereby suggesting that this was, at core, a case about faulty memory, would have undercut the central defense argument. In short, trial counsel were pursuing a reasonable defense strategy,

13

and were zealous advocates in pursuit of that strategy.  There was nothing remotely ineffective about their decision not to call a drug expert.

Finally, in light of the evidence presented at trial, Grecco comes nowhere close to demonstrating "a reasonable probability" that the outcome at trial would have been different if the defense had called a drug expert.  *Strickland*, 466 U.S. at 694.  For this reason as well, Grecco's claims fail.

### 2.  Counsel's Alleged Failure to Move to Preclude Petitioner's Post-Arrest Statements

Grecco also argues that trial counsel were ineffective for failing to move to suppress his post-arrest statements on the claim that he was intoxicated and under the influence of various drugs.  (Pet. 14-15.)

Courts have repeatedly held that a *Miranda* waiver may be voluntary even if the speaker is under the influence of alcohol or narcotics.  *See, e.g., Williams v. Lee,* No. 14-CV-597, 2019 WL 935958, at *6 n.4 (S.D.N.Y. Feb. 26, 2019) ("To the extent that Petitioner claims his statements were also coerced because he had consumed alcohol at some point in the evening prior to his interrogation, that is . . . insufficient to invalidate his waiver of his *Miranda* rights."); *United States v. Wyche,* 307 F. Supp. 2d 453, 463 (E.D.N.Y. 2004) ("A statement may still be voluntary . . . even when the speaker is intoxicated or under the influence of drugs, as there is no *per se* rule that a confession given under such circumstances is involuntary.").  Thus, it is far from clear that trial counsel had a sufficient reason, let alone a constitutional obligation, to move to suppress Grecco's post-arrest statements.  In any event, because the Government advised trial counsel before trial that it would not offer the post-arrest statements in its case-in-chief, and the Government in fact did not offer those statements in its case-in-chief, trial counsel cannot be

14

faulted for failing to move to suppress statements that were not being offered by the Government.

Moreover, the jury learned of Grecco's post-arrest statements only because he decided to testify, opening the door to the use of these statements on cross-examination for impeachment. Grecco would have been subject to cross-examination on these statements even if his counsel had successfully moved to suppress them. *See James v. Illinois*, 493 U.S. 307, 308–09 (1990) ("The impeachment exception to the exclusionary rule permits the prosecution in a criminal proceeding to introduce illegally obtained evidence to impeach the defendant's own testimony."); *United States v. Ramirez*, 609 F.3d 495, 500 n.1 (2d Cir. 2010) ("[A] defendant's statements on cross-examination may be impeached by evidence otherwise suppressed under the exclusionary rule."). Thus, there was no error by defense counsel, much less a constitutional one, and there was no prejudice to the defendant.

Grecco also asserts, without any support whatsoever, that there was some sort of "Gentleman's Agreement" regarding what the Government would ask him on cross-examination. (Pet. 15.) This type of conclusory, self-serving claim, lacking any corroboration, cannot serve as the basis for a § 2255 claim. *See Chang v. United States,* 250 F.3d 79, 86 (2d Cir. 2001) ("[Petitioner] bore the burden of proving his claim. His proffer involved a generic claim—one that can be . . . made in any case in which a defendant fails to testify—based solely on his own highly self-serving and improbable assertions."); *United States v. Gordon*, 156 F.3d 376, 380–81 (2d Cir. 1998) (noting that a defendant must provide "some further objective evidence" beyond "self-serving, post-conviction testimony" (quotation marks omitted)); *Grullon v. United States*, 99-CV-1877, 2004 WL 1900340, at *6 (S.D.N.Y. Aug. 24, 2004) ("In considering an ineffective

counsel claim, a court need not accept a petitioner's uncorroborated, self-serving testimony as true."). Therefore, the Court rejects this claim.

### 3.  Counsel's Alleged Failure to Move for a Continuance

Grecco claims that his trial counsel were ineffective because they failed to seek a continuance after the Government filed a superseding indictment "[f]our [d]ays before the trial began." (Pet. 16.)  According to Grecco, this superseding indictment charged murder under the Travel Act, thereby resulting in a charge "which carries life imprisonment," whereas previously he "only faced 20 years."  *Id.*  The Court construes Petitioner to be arguing that his trial counsel should have sought a continuance under 18 U.S.C. § 3161(c)(2), which provides that "[u]nless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se."  18 U.S.C. § 3161(c)(2).

This claim fails for several reasons.  To begin, "Congress did not intend that the 30-day trial preparation period begin to run from the date of filing of a superseding indictment."  *United States v. Rojas-Contreras*, 474 U.S. 231, 234 (1985).  To be sure, a criminal defendant should not "always be compelled to go to trial less than 30 days after the filing of such an indictment."  *Id.* at 236.  Indeed, "[t]he [Speedy Trial] Act itself places broad discretion in the District Court to grant a continuance when necessary to allow further preparation," and this discretion "should take care of any case in which the Government seeks a superseding indictment which operates to prejudice a defendant."  *Id.*  The Second Circuit has echoed the same sentiment, explaining that 18 U.S.C. § 3161(c)(2) does not "divest[ ] a district court of its discretion to grant or refuse a continuance," and that "[w]hen a superseding indictment makes only insubstantial changes in an original indictment . . . a district court may exercise its discretion in proceeding to trial without

delay." *Howard v. United States*, Nos. 04-CR-942, 10-CV-2775, 11-CV-5208, 2018 WL 3973005, at *2 (E.D.N.Y. Aug. 20, 2018) (first and third alteration in original) (quoting *United States v. Guzman*, 754 F.2d 482, 486 (2d Cir. 1985)).

Here, the S6 Indictment, which was the final superseding indictment, was not filed, as Petitioner claims, four days before trial.  It was filed on December 14, 2015, 28 days before trial, which began on January 11, 2016.  Petitioner was arraigned on the S6 Indictment at the final pretrial conference on January 7, 2016, four days before trial.  (*See* Dkt. 27; Dkt. (minute entries for Jan. 7, 2016 and Jan. 11, 2016), Case No. 14-CR-760.)

Moreover, the S6 Indictment did not increase Petitioner's sentencing exposure in the slightest.  The Travel Act carries no mandatory minimum sentence, and a maximum sentence of five years, 20 years, or, "if death results," life imprisonment.  *See* 18 U.S.C. § 1952.  Prior to the S6 Indictment, Petitioner had already been charged, in both the S2 and S3 Indictments with a Travel Act violation resulting in the death of Ryan Ennis, carrying a maximum sentence of life imprisonment.  (Dkt. 15, 16, Case No. 14-CR-760.)  The S6 Indictment amended the Travel Act count in the S3 Indictment (Count Five) to add murder as one of the crimes of violence (in addition to robbery and assault) that the defendant intended to commit and in fact committed when he traveled from New Jersey to Ossining on August 26, 2014.  (*See* Dkt. 30 (explaining the change in the superseding indictment), Case No. 14-CR-760.)  Thus, in the S6 Indictment, Petitioner was still facing a maximum sentence of life imprisonment.  Furthermore, this change in the S6 Indictment did not alter the evidence at trial:  There was no additional discovery or witness testimony as a result of the superseding indictment.  Thus, there was no prejudice to Petitioner from the S6 Indictment, and no basis for trial counsel to move for a continuance. Therefore, the fact that they did not seek a continuance cannot be deemed as ineffective

assistance, and, in any event, Petitioner has made no showing of actual prejudice from the timing of the trial.  This claim is therefore rejected.

### 4.  Counsel's Alleged Failure to Object to the Conduct of the United States Marshals Service

Grecco next claims that his counsel were constitutionally ineffective because they failed to object to the positioning and movement of Deputy United States Marshals in the courtroom during the trial, both when he was seated with counsel and when he was testifying.  According to Grecco, the jurors would have inferred from the security in the courtroom that Grecco was detained pretrial, thereby prejudicing his defense.  Grecco further claims that the Marshals' presence and restrictions on his movement somehow interfered with his ability to communicate with counsel.  (Pet. 17–18.)

These claims are meritless.  During the course of the trial, there were two Marshals, in plainclothes, seated behind Grecco.  This was consistent with standard practice in the District for any criminal trial involving an in-custody defendant.  When Grecco testified, there was a plainclothes Marshal seated nearby, which, again, is consistent with standard practice in the District.  There was nothing improper or prejudicial about the relatively low-key presence of the Marshals.  Indeed, a far more visible courtroom presence of security has been found to be constitutionally unobjectionable.  *See Holbrook v. Flynn*, 475 U.S. 560, 568–72 (1986) (holding that four uniformed state troopers sitting in the front row of the courtroom as a supplement to routine courtroom security was not improper, and explaining that "the conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial" is not "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial").  Moreover, the presence and positioning of the Marshals in the courtroom was visible throughout to the Court, which did not trigger any

18

concerns regarding the conduct of the Marshals during the trial.  *Id.* at 572 ("All a federal court may do . . . is look at the scene presented to jurors and determine whether what they saw was so inherently prejudicial as to pose an unacceptable threat to defendant's right to a fair trial[.]").  Trial counsel did not object to the positioning and conduct of the Marshals because there was nothing remotely objectionable concerning their actions.

Grecco also seems to suggest that the presence and direction of the Marshals somehow interfered with his ability to interact with his attorneys, but he offers no evidence to support this self-serving claim, thus dooming it from the start.  *See Grullon*, 2004 WL 1900340, at *6 ("In considering an ineffective assistance claim, a court need not accept a petitioner's uncorroborated, self-serving statements as true.").  A petitioner cannot simply point to the presence of the Marshals in the courtroom, without a shred of evidence, as a means of obtaining habeas relief under § 2255.  Throughout the trial, the Marshals conducted themselves professionally and treated the defendant fairly and respectfully, and there was no basis for any possible claim or motion by trial counsel.

Finally, there is no evidence of actual prejudice, as there is no basis to conclude that the actions or positioning of the Marshals somehow affected the outcome of this trial.  Thus, for all these reasons, the Court rejects this claim.

### 5.  Counsel's Alleged Failure to Object to the Testimony of Witnesses About Their Incarceration

Grecco next suggests that his trial counsel were ineffective because they did not object to the testimony of the Government's cooperators regarding their pretrial detention, on the claim that it would have been "obvious" to the jury that Grecco also was detained, thereby prejudicing his defense.  (Pet. 18–19.)  However, Petitioner has offered no authority that his trial counsel could have cited to preclude such testimony from witnesses regarding their incarceration.  And,

19

any claim that the jury would have drawn inferences regarding Grecco's detention is pure speculation.  Finally, Petitioner has not proffered any evidence a successful motion on this ground would have had a reasonable probability of a favorable verdict.  Thus, the Court rejects this claim.

### 6.  Counsel's Alleged Failure to Object to His Detention on State Charges

Petitioner argues that he was improperly detained on a state narcotics charge "while federal agents set up a case against him," and that his trial counsel failed to address this issue. (Pet. 19.)

Petitioner's Sixth Amendment right to counsel is "offense-specific," and, in this case, did not attach until the federal prosecution commenced.  *United States v. Espinal,* 96 F. Supp. 3d 53, 64 (S.D.N.Y. 2015) (citing *United States v. Mapp*, 170 F.3d 328, 334 (2d Cir. 1999)).  Moreover, "the Supreme Court has incorporated double jeopardy analysis, including the dual sovereignty doctrine, into its Sixth Amendment jurisprudence," and thus, by definition, the state case (a prosecution by one sovereign) could not have triggered a right to counsel in the federal case (a prosecution by a different sovereign).  *United States v. Worjloh*, 546 F.3d 104, 109 (2d Cir. 2008) (quotation marks and citation omitted).  Simply put, the prosecution by the state has no bearing on the proceedings before this Court, or the effectiveness of trial counsel's advocacy in this case.  And to the extent Petitioner is suggesting that his state court counsel should have challenged his detention, the law is clear that a defendant cannot use a § 2255 motion to challenge the performance of counsel in a separate state court case.  *See, e.g.*, *United States v. Money*, Nos. 16-CR-56, 19-CV-260, 2021 WL 1435276, *9 (E.D. Ky. Jan. 14, 2021) ("To the extent that Money seeks this Court to right the perceived wrongs of the state court, Money has not chosen the proper avenue."); *Johnson v. United States*, No. 14-CV-1066, 2015 WL 6040306,

at *3 (W.D. Mich. Oct. 15, 2015) ("Movant's contention that he was denied effective assistance

of counsel with respect to the state court action is not a basis for relief in this § 2255 federal

habeas action.  A federal habeas action is not designed to remedy violations in a separate state

court action."); *United States v. Daniels*, Nos. 03-CR-30019, 06-CV-1770, 2007 WL 2668891, at

*3 (W.D. La. May 30, 2007) ("To the extent that [the defendant] challenges the performance of

his attorney in the state prosecution prior to or following the motion to suppress, those claims are

not properly raised in the context of this § 2255 motion.").  Thus, this claim is rejected.

### 7.  Counsel's Alleged Failure to Call a Crime Scene Expert

Grecco next complains that his trial counsel were ineffective for failing to call a crime

scene expert who could have testified regarding the alleged mistakes made by law enforcement

at the scene of Ennis's murder.  (Pet. 20–21.)  But defense counsel vigorously cross-examined

Detective Piccirilli regarding investigative steps and avenues of forensic inquiry that were not

pursued by Detective Piccirilli and his colleagues when processing the crime scene.  (*See* Tr.

357–83.)  Indeed, Grecco concedes that the cross-examination was highly effective.  (Pet. 20

("Under direct and cross, Mr. Piccirilli revealed the fact that the crime scene team, including

himself, botched a murder scene investigation.").)  Having effectively cross-examined the

Government's crime scene witness, having successfully elicited the limitations of the crime

scene evidence, and having revealed a host of steps that were not taken by the crime scene team,

it was a reasonable strategic choice not to call a defense expert on the subject.  *See Boyle v.

McKune,* 544 F.3d 1132, 1139 (10th Cir. 2008) ("Counsel's cross-examination of the

prosecution's expert nurse witnesses evidence a sufficient understanding of the nature of the

evidence against Boyle and its potential weaknesses."); *Bell v. Miller*, 500 F.3d 149, 156 (2d Cir.

2007) ("'[T]he defendant must overcome the presumption that, under the circumstances, the

challenged action might be considered sound trial strategy.'" (quoting *Strickland*, 466 U.S. at 689)).  It certainly cannot be deemed ineffective assistance.  Moreover, there has been no showing of actual prejudice to Grecco, as this was not a case that turned on crime scene evidence.  Instead, it was about the credibility of the Government's cooperators and immunized witnesses.  Even if Petitioner's trial counsel used a crime scene expert, there is no reasonable probability that the outcome of the case would have been any different.  *See Boyle*, 544 F.3d at 1139 ("Given the nature of the evidence arrayed against him and his chosen defense, there is no reason consulting medical experts or putting them on the witness stand would have changed the outcome of Boyle's trial.").  Thus, the Court rejects this claim.

### 8.  Counsel's Alleged Failure to Object to the Admission of Photographs of the Victim

Next Grecco asserts that trial counsel were ineffective in failing to object to the admission of certain photographs showing Ennis's body at the crime scene.  In particular, Grecco argues that the introduction of the photos "inflamed the passions of the jury," (Pet. 21), and prejudiced the jurors against him.  The Court is unpersuaded, as Grecco cannot establish that counsel's lack of objection was unreasonable, and, in any event, because the Court admitted the photos, Grecco was not prejudiced by counsel's decision.  *See Carruth v. Hamm*, No. 14-CV-1107, 2022 WL 4357471, at *85 (M.D. Ala. Sept. 20, 2022) (rejecting ineffective assistance claim based on a failure to object to crime scene or autopsy photos because they were "relevant to explain the sequence of events"); *Allen v. Kerestes,* No. 15-CV-189, 2019 WL 13259186, at*8 (W.D. Pa. Nov. 5, 2019) ("Any claim of ineffectiveness on the part of trial counsel on this issue must be based on a foundational finding that admission of the photographs was so clearly improper that [trial counsel] did not just err, but erred so badly that they failed to act as counsel required by the Sixth Amendment.  Petitioner does not show this."), *report and recommendation*

*adopted*, 2019 WL 13259187 (W.D. Pa. Nov. 22, 2019).  Simply put, Grecco cannot meet his

burden of showing that counsel's decision not to object to the photos "*cannot* be explained

convincingly as resulting from a sound trial strategy, but instead arose from oversight,

carelessness, ineptitude, or laziness."  *Barnes v. Burge*, 372 F. App'x 196, 199 (2d Cir. 2010)

(summary order) (emphasis in original) (citation and quotation marks omitted).  Given counsel's

strategic choice to argue to the jury that Ingram committed the murder without Grecco's

participation or knowledge, counsel could reasonably have believed that allowing the photos to

come before the jury would not prejudice the defense, since an alternative perpetrator for the

crime was being offered, and might actually aid in the defense's efforts to identify Ingram as a

violent career criminal who most likely committed the murder.

      Grecco's claim independently fails because the Government sought and obtained a ruling

from the Court that the most graphic of the photographs in question were admissible and not

unduly prejudicial.  Indeed, the night before the final pretrial conference, the Government

submitted a letter to the Court discussing 11 crime scene photographs that it argued were not

unduly prejudicial under *Old Chief v. United States*, 519 U.S. 172, 180, 187–88 (1997), and its

progeny.  The Court admitted the majority of the photographs, but excluded the photograph that

had been marked as Government Exhibit 21-M, a direct view of the victim's face that showed

him looking into the camera.  Grecco has offered no reason to believe that the Court's rulings on

the admissibility of the photographs would have been different if the defense, rather than the

Government, had solicited that ruling.  *See Kerestes*, 2019 WL 13259186, at *8 ("Petitioner does

not contest the factual accuracy of these explanation, but rather asserts that they are irrelevant

because according to petitioner the issue is not admissibility but rather ineffectiveness.  This is

good rhetoric but it is not correct.  Ineffective assistance of counsel cannot be shown when the

argument or objection that counsel failed to make is a meritless argument or objection." (citation

omitted)).  The Court thus rejects this claim.

### 9.  Counsel's Alleged Failed to Prepare Him to Testify

Petitioner next claims that defense counsel were ineffective in preparing him to testify.

( Pet.21–22.)  However, he provides no support for this claim other than a bald assertion that is

clearly belied by the record, which itself is fatal to this claim.  *See Grullon*, 2004 WL 1900340,

at *6 (noting that courts need not accept uncorroborated, self-serving statements by a habeas

petitioner).  In any event, trial counsel indicated on the record, in Grecco's presence, that he had

discussed the decision to testify with his client, noting "it's a significant tactical decision."  (Tr.

824.)  Petitioner did not object to counsel's assertions or suggest that the conversations had not

taken place, and it is entirely unclear how a conversation regarding the tactical wisdom of

testifying could occur without discussing the risks of cross-examination.  When it was time for

him to testify, Grecco answered counsel's questions on direct examination, making clear that the

examination had been prepared in advance.  Indeed, when, at one point during the direct

examination, the Government objected to an area of questioning that the Court ruled

inadmissible, counsel requested a recess to "tighten . . . up" his questioning with Grecco, so that

Grecco did not testify to facts that counsel had apparently elicited during their preparation.  (Tr.

954.)  On cross-examination, Grecco made clear that he was prepared for the Government's

questions.  He had ready answers to the Government's inquiry regarding the most damning

evidence against him, including, for example, questions about why he took Aaron Tupin's knife

the day of the murder.  (Tr. 965 (Grecco testifying that the knife was "collateral" for a drug

deal).)  He also answered questions about his criminal history on both direct examination and

cross-examination.  (Tr. 972–74, 1004.)

Even if Grecco could show that counsel failed to prepare him to testify, and he cannot, he has not explained how his testimony prejudiced him.  While the Government argued that the testimony should not be believed, Grecco's testimony that he learned of Ennis's murder from Ingram and that he had seen Ingram with an item that, Grecco suggested, was Ennis's cellphone, were key pieces of evidence upon which the defense theory relied.  Without this testimony, defense counsel would have been hard pressed to offer a viable argument that Ingram was the murderer.  While the defense was not ultimately successful, given the overwhelming strength of the Government's case-in-chief, Grecco has not shown how he would have been in a substantially better position if he had not taken the stand.  Thus, the Court concludes that this claim fails.

### 10.  Appellate Counsel's Alleged Failure to Challenge the Sufficiency of the Evidence

Grecco claims that his appellate counsel, who were different from trial counsel, were ineffective because they failed to challenge the sufficiency of the evidence on appeal.  (Pet. 22.) Experienced counsel from a well-known law firm represented Grecco on appeal, and raised several non-frivolous legal claims, any one of which could have resulted in a reversal of the conviction and a new trial for Grecco.  While counsel did not challenge the sufficiency of the evidence, that strategic decision was hardly unreasonable.  For example, appellate counsel could easily have concluded that the legal claims that they presented were more likely to receive careful consideration if they were not accompanied by a clearly meritless sufficiency claim.

 Indeed, there is no doubt that any sufficiency claim would have failed.  To succeed on such a claim, Grecco would have been required to convince the Second Circuit that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Martoma*, 894 F.3d 64, 72 (2d Cir. 2017) (citation and quotation marks omitted).

And, in considering sufficiency claims, questions about the "credibility of witnesses," "choices between permissible inferences," and "assessment of the weight of the evidence" are matters for the jury and will not be overturned on appeal. *United States v. Jones*, 482 F.3d 60, 68 (2d Cir. 2006).

Here, although the evidence against Grecco was circumstantial in certain respects, it overwhelmingly established Grecco's responsibility for the murder. The evidence included two cooperating witnesses who testified to facts and statements by Grecco implicating him in the murder, Grecco's friend Tupin, who testified that he had provided Grecco with a knife on the day of the murder, and another friend, Wyckoff, who testified that shortly after the murder, Grecco told him that "shit had gone south" with the victim. (Tr. 88, 91, 94–95, 112, 119–20, 305, 456–59, 462–66, 574–77, 582–83.) Moreover, phone records demonstrated that, contrasted with his frequent efforts to contact Ennis before the murder, Grecco never attempted to contact him after traveling to Ossining. (Tr. 1153.) This evidence was far more than sufficient to support a conviction, as this Court recognized in denying the defendant's Rule 29 motions. (Tr. 847–48, 1031.) Given the significant deference accorded to a jury's verdict, it was more than reasonable for appellate counsel to forgo a sufficiency argument that would have been wholly meritless. *See Proctor v. McCarthy*, No. 19-CV-2988, 2020 WL 1149660, at *22 (S.D.N.Y. Mar. 10, 2020) ("[C]ounsel's failure to argue on direct appeal that . . . the evidence was insufficient to establish physical injury cannot be said to have changed the result of the proceedings. Indeed, . . . appellate counsel's strategy was reasonable and sound, and the claims asserted . . . were cogently argued. Appellate counsel raised two colorable arguments on appeal, either of which, if successful, would have resulted in vacatur [of the conviction]."), *report and recommendation adopted*, 2023 WL 4562405 (S.D.N.Y. July 17, 2023).

### 11.  Counsel's Alleged Failure to Object to the Government's Opening Statement

Grecco next argues that his trial counsel were ineffective for failing to object to the Government's opening statement.  In particular, Grecco notes that, during his opening, Government counsel referred to the murder of Ryan Ennis and said Grecco was responsible for the murder.  (Pet. 23.)  Grecco implies that the identification of him as the murderer at the very beginning of the trial prejudiced the jury against him.  (*Id.*)  However, there was nothing remotely prejudicial about the Government's statement that it would prove its case.  Indeed, it would be odd for a prosecutor to provide an opening statement that did not claim the prosecution would offer evidence to establish the guilt of the person on trial.  Nothing about the opening statement in this case sets it apart.  Thus, there was no ineffective assistance about counsel's decision to not object to the unobjectionable opening statement.  *Cf. Cuevas v. Henderson*, 801 F.2d 586, 592 (2d Cir. 1986) (concluding that because "[t]he prosecutor's summation was appropriate . . . defense counsel's failure to object does not support a conclusion that his performance was not reasonably competent").

### 12.  Counsel's Conduct of Jury Selection

Grecco next argues that trial counsel were ineffective in failing to move to disqualify for cause or exercise peremptory challenges to remove certain jurors who had connections to law enforcement or, in one case, had previously been robbed.  (Pet. 24.)  Yet, Grecco has identified no evidence that would demonstrate that the jurors he identifies should have been stricken for cause.  The Second Circuit "has consistently refused to create a set of unreasonably constricting presumptions that jurors be excused for cause due to certain occupational or other special relationships which might bear directly or indirectly on the circumstances of a given case, where . . . there is no showing of actual bias or prejudice."  *United States v. Torres*, 128 F.3d 38, 46 (2d

Cir. 1997) (alteration in original) (citation and quotation marks omitted).  Here, each of the jurors

stated under oath that he/she could be fair and impartial and that their ability to weigh the

evidence impartially would not be affected by their prior experiences or associations.  To the

extent Grecco questions counsel's use of peremptory challenges, the law is clear that

"[s]trategies as to the exercise of peremptories are matters of counsel's intuition, and do not rise

to the level of constitutional error."  *Doleo v. Reynolds*, No. 00-CV-7927, 2002 WL 922260, at

*4 (S.D.N.Y. May 7, 2002).

### 13.  Plea Negotiations

Finally, Grecco claims that his trial counsel were ineffective in connection with pretrial

plea negotiations.  (Pet. 25.)  In particular, Grecco makes two claims.  First, he alleges that the

lawyer initially appointed to represent him[4] refused to seek a plea offer from the Government

that would have capped his sentencing exposure at 20 years.  (*Id.*)  Second, he alleges that

retained counsel, who represented him at trial, failed to advise him to accept the Government's

30-year plea offer and misled him about his post-trial sentencing exposure.  (*Id.*)

Grecco's claim that Mr. Rinaldo acted ineffectively in failing to seek a 20-year plea offer

lacks any merit.  The Government did not make a 20-year offer to Grecco and he has not offered

any evidence that he would have accepted such an offer if it had been made.  Indeed, as will be

further discussed, Grecco consistently maintained his innocence and at no point expressed any

interest in pleading guilty.  Based on this factual landscape, Grecco cannot establish any

ineffectiveness of counsel or prejudice from any the representation he did receive.  *See Raysor v.*

*United States*, 647 F.3d 491, 495 (2d Cir. 2011) (noting that to meet the prejudice prong in

---

[4] Grecco's reference to "Mr. Regalo," (Def. Mot. 24–25, 27), appears to be a reference to
Paul Rinaldo, Esq., who was briefly appointed to represent Grecco before he retained counsel.

connection with plea negotiations, a petitioner "must demonstrate a reasonable probability that but for counsel's deficient performance, he would have pled guilty instead of going to trial"). Moreover, even if, as Grecco claims, Mr. Rinaldo resisted his request to seek a plea offer from the Government at the beginning of the case, that would not establish that Mr. Rinaldo acted ineffectively.  Indeed, Mr. Rinaldo could easily have believed that the most favorable point to negotiate over a disposition was after motion practice, particularly given that he had a potentially meritorious claim to suppress portions of Grecco's post-arrest statement.

As for Grecco's claim that trial counsel was ineffective in connection with the plea offer that the Government actually *did* make, that claim also lacks merit.  As Grecco concedes, on July 15, 2015, the Government extended Grecco a written plea offer through his counsel that would have capped Grecco's sentencing exposure at 30 years.  (*See* Gov't Opp., Ex. A.)  In the cover email that accompanied the proposed plea agreement, the Government informed defense counsel in writing as follows:

> [I]f your client does not accept the enclosed offer by July 31, 2015, the Government intends to seek a superseding indictment charging your client with a Travel Act murder in violation of Title 18, United States Code, Section 1952.  The addition of a Travel Act count would subject your client to a maximum potential sentence of life imprisonment and, under the Government's view of the Guidelines as set out in the enclosed plea agreement, an advisory Guidelines sentence of life imprisonment.

(*See* Gov't Opp., Ex. B.)  On August 4, 2015, Grecco appeared for a reverse proffer at the United States Attorney's Office.  During the reverse proffer, the Government reviewed with Grecco the Government's evidence against him and the terms of the July 15 plea offer (the deadline for which had been extended at counsel's request).  The Government also informed Grecco that, if he rejected the offer, the Government would supersede with a murder charge that would raise the statutory maximum sentence to life and that, in the event of a conviction, it was very likely that

he would sentenced to life imprisonment.  Grecco offers no evidence that he did not understand that life imprisonment meant anything other than life without parole.

Ultimately, Grecco rejected the Government's plea offer.  In his Petition, Grecco claims that counsel discouraged him from accepting the offer, saying of the Government's evidence, "all they have is two drug addicts with weak, hearsay testimony." (Pet. 25.)  Even if this were true, Petitioner would not establish that counsel acted ineffectively.  "Counsel's advice about whether to accept or reject a plea . . . constitutes strategic advice that should not be second-guessed by the court." *United States v. Peterson*, 896 F. Supp. 2d 305, 315 (S.D.N.Y. 2012).  Indeed, as the Second Circuit has explained, "because representation is an art," "[c]ounsel's conclusion as to how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea enjoys a wide range of reasonableness." *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000) (alteration, citation, and quotation marks omitted).  Here, the Court cannot say that it was objectively unreasonable for counsel to advise Grecco that there was some possibility of acquittal, given that the Government's case relied largely on circumstantial evidence and the testimony of cooperating witnesses, none of whom personally witnessed the murder.  For all these reasons, the Court rejects this claim.

### III.  Conclusion

For the foregoing reasons, the Petition is dismissed with prejudice.  The Clerk of Court is respectfully directed to terminate the instant Petition, enter judgment for Respondent in Case No. 19-CV-7950; close Case No. 19-CV-7950; and mail a copy of this Opinion to Plaintiff at the address listed in the docket for Case No. 19-CV-7950.  Furthermore, the Court finds that Petitioner has not made a substantial showing of a denial of a federal right, and that appellate review is therefore not warranted, *see Tankleff v. Senkowski*, 135 F.3d 232, 241 (2d Cir. 1998);

30

and, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal taken from the order would not be in good faith, *see Coppedge v. United States*, 369 U.S. 438, 445 (1962).

SO ORDERED.

Dated:   September 27, 2023
         White Plains, New York

_____
KENNETH M. KARAS
United States District Judge